[Cite as *Machen v. Miller*, 2024-Ohio-1270.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

S. KAREN MACHEN,                           :

      Plaintiff-Appellant/          :
      Cross-Appellee,                            Nos. 112453, 112454, and
                                           :      112479

      v.                                         :

ALFRED THOMAS MILLER, JR.,                 :

      Defendant-Appellee/           :
      Cross-Appellant.              :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, REVERSED IN PART,
              AND REMANDED
**RELEASED AND JOURNALIZED:** April 4, 2024

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-18-374625

---

***Appearances:***

Rosenthal | Thurman | Lane, L.L.C., Scott S. Rosenthal,
and James L. Lane, *for appellant/cross-appellee*.

Stafford Law Co., L.P.A., Joseph G. Stafford, Nicole A.
Cruz, and Kelley R. Tauring, *for appellee/cross-appellant*.

LISA B. FORBES, J.:

{¶ 1}     S. Karen Machen ("Wife") and Alfred Thomas Miller, Jr. ("Husband")

appeal from the trial court's journal entry granting them a divorce. After reviewing

the facts of the case and pertinent law, we affirm in part, reverse in part, and remand this case to the trial court for further proceedings consistent with this opinion.

## I.    Facts and Procedural History

{¶ 2}    Wife and Husband were married on May 25, 1996.  On November 30, 2018, Wife filed a complaint for divorce.  Husband failed to file an answer.  Both parties appeared and gave testimony at a hearing on March 18, 2019.  Husband appeared pro se, and Wife was represented by counsel.  That same day, the court issued a "judgment entry of divorce," which "ordered * * * that [Wife] be and is hereby granted a divorce from" Husband, dissolved the marriage, and divided the marital property.  This judgment entry also ordered that "neither party shall pay spousal support to the other."

{¶ 3}    On April 3, 2019, Husband, who was represented by counsel at that time, filed a "motion for relief from judgment[,] motion to vacate judgment[, and] motion for attorney fees and litigation expenses" concerning the March 18, 2019 judgment entry of divorce.  On April 10, 2019, Husband filed an appeal concerning the same March 18, 2019 judgment entry ("Original Divorce Decree"), which divested the trial court of jurisdiction to rule on the motion for relief from judgment.

{¶ 4}    On June 26, 2019, Husband filed a motion in this court for limited remand to the trial court, requesting that this court order the trial court to rule on his motion for relief from judgment.

{¶ 5}    The court granted Husband's motion for relief from judgment and motion to vacate judgment on July 10, 2019, and reinstated the case to the court's

active docket. In its journal entry, the court vacated the judgment entry of divorce "pursuant to Civ.R. 60(B)(5) and in the interest of justice * * *."

{¶ 6} Husband filed an answer to Wife's complaint for divorce and voluntarily dismissed his appeal. Over the next two years, and notably during the Covid-19 pandemic, the parties filed several motions, and the court scheduled and cancelled several hearings, attorney conferences, and "trial/in-persons."

{¶ 7} On March 25, 2021, the court issued orders scheduling trial for November 4, 5, 15, and 16, 2021. The court issued an amended order on October 5, 2021, rescheduling trial for November 4, 2021, only and imposing various limitations on the amount of time the parties could spend presenting this case. The limitations included the following: "Direct examination of witnesses shall be limited to 60 minutes per witness and cross-examination of witnesses shall be limited to 30 minutes per witness." The court held a one-day trial on November 4, 2021.

{¶ 8} On June 8, 2022, the court issued a magistrate's decision, which "ordered * * * that [Husband] is hereby granted a divorce from" Wife, dissolved the marriage, divided the marital property, ordered Wife to pay Husband $4,000 per month in spousal support for 96 months, and ordered Wife to pay Husband $44,000 for attorney fees.

{¶ 9} The parties filed objections to the magistrate's decision, and on February 2, 2023, the court issued a judgment entry overruling Wife's objection Nos. 1-6, 8-12, and 14-16 in their entirety; overruling in part and sustaining in part Wife's objection Nos. 7 and 13; and overruling Husband's objection Nos. 1-3. On

February 6, 2023, the court issued a journal entry adopting the magistrate's decision except as modified. The details of the parties' objections and the court's adoption of the magistrate's decision except as modified will be discussed further in this opinion when necessary.

{¶ 10} On March 1, 2023, Wife filed two notices of appeal, which challenged the journal entry ruling on the objections to the magistrate's decision and the journal entry adopting the magistrate's decision except as modified. On March 8, 2023, Husband filed a notice of appeal, which challenged the journal entry ruling on the objections to the magistrate's decision and the journal entry adopting the magistrate's decision except as modified.

{¶ 11} These appeals have been consolidated and the assignments of error will be addressed together and out of order when appropriate. Wife raises 18 assignments of error, and Husband raises three cross-assignments of error for our review.

## II. Hearing Testimony and Evidence

### A. Wife's Testimony

{¶ 12} Wife testified that she currently lives in Florida, having moved there in "January 2018 for a job." She further testified that she came back to Ohio "multiple times to stay in the home and to be with my family." In June 2019, Wife "moved [her] items out of the house." She also testified that the last time she spent the night at the marital residence "was some time in 2018."

{¶ 13} Wife is a physician, and she works for West Side Pathology Associates ("WSPA"). According to Wife, WSPA is a company that she owns, and she provides pathology services for "two corporations." Wife "bought into" WSPA in 2005 or 2006, and she became the sole owner of the business in January 2018. Wife testified that she does not recall what the "buy in" for WSPA was. According to Wife, she is the sole employee of WSPA, and the company's only asset "is just a checking account."

{¶ 14} Wife testified that, prior to her filing the complaint for divorce, she and Husband attempted to mediate a resolution for the termination of their marriage. This attempt started in June 2018 and ended in September 2018.

{¶ 15} Regarding a joint checking account the parties had at Key Bank, Wife testified she did not deposit her income into this account during the marriage, but she used her "personal checking account * * * to pay expenses." Husband deposited his income into this joint checking account, and she "would take money from his account to pay the joint expenses." She further testified that she "stopped getting money from [Husband's] account in October 2018." According to Wife, she and Husband did not use "any joint accounts" after October 2018. She further testified that she and Husband had a "shared credit card" through March 2019.

{¶ 16} Wife explained that there were no proceeds when they sold the marital residence, and she paid the closing costs of $4,100. The parties listed the house in November 2018, she paid the "primary mortgage" through May 2019, and she paid the home equity loan until the property sold in May 2021. She also paid

the property taxes and insurance. According to Wife, Husband never paid the mortgage, home equity loan, property tax, or insurance.

{¶ 17} Asked to describe their "financial lifestyle" when Husband and Wife "lived together," Wife testified that they "both were employed and both contributed to the household." According to Wife, they both contributed to their two children's private school education, although Wife paid for the last two years of their son's high school tuition, which was "over $30,000" annually. Husband did not contribute financially to the last two years of their son's high school education.

{¶ 18} Wife testified that she receives "$150,000 a year" in wages, and this "has been consistent over the last few years." She also receives distributions "to pay a credit card bill." Asked "how much if any money have you distributed out of the business to pay for a credit card bill" this year, Wife answered, "I don't know." She further testified that "the business" paid for what she referred to as "personal expenses" such as health insurance and a cell phone.

{¶ 19} Our review of the exhibits introduced into evidence shows that in 2020, Wife's IRS form 1040 shows a taxable income of $214,540.

{¶ 20} Asked what "financial support" Husband provided for her career, Wife testified, "Zero. Nothing." Wife testified that Husband did not pay for any of Wife's "schooling." Husband and Wife were married when Husband "got his Executive MBA at Case Western." According to Wife, they each paid their own student loans, and she had "no idea" what student loans Husband "incurred during the marriage to obtain that MBA."

{¶ 21} Wife further testified that, since she and Husband separated in 2018, she did not pay for any of his expenses, and he did not pay for any of her expenses. Wife testified that "[h]e makes a fair wage. I make a fair wage. He could provide for himself. I could provide for myself."

{¶ 22} On cross-examination, Wife testified further about her "compensation." According to Wife, WSPA is compensated $280,000 annually, plus a $15,000 annual bonus. This testimony is consistent with a "compensation and services agreement" that was introduced into evidence. This agreement is between WSPA and various medical entities, and it states that WSPA's compensation is $280,000 annually, plus a $15,000 annual bonus.

{¶ 23} Wife testified that she puts $30,000 to $40,000 per year in a profit-sharing plan. Wife testified that the gross receipts on WSPA's 2020 tax returns were $325,300.[1] Wife testified about exhibit M, which is WSPA's 2020 IRS Schedule K-1, and stated that she took $60,000 in distributions.[2]

## B. Husband's Testimony

{¶ 24} Husband testified that he currently lives in Los Angeles, California, where he relocated for a job in April 2021. Asked about the parties' lifestyle during their marriage, Husband answered, "It was comfortable. It was nice." Husband testified that his income "with Taylor Oswald [was] 135," and he currently makes "165." According to Husband, when the parties married, Wife was finishing her

---

[1] A review of this exhibit shows that WSPA's gross receipts for 2020 were $325,373.

[2] A review of this exhibit shows that, in 2020, Wife took distributions of $60,211.

medical residency, and Husband "dropped out of law school and worked full time." Asked if him dropping out of school helped Wife with her career, Husband answered, "I tried to be as supportive as I could."

{¶ 25} Husband testified that his "check" was deposited into the parties' joint checking account "all of the period of time that [he] lived here in Cleveland."

{¶ 26} Husband testified as follows regarding his efforts at reconciliation with Wife. "Prior to her leaving [for Florida], I asked about having our wedding vows renewed * * * and she declined. Prior to her leaving, I asked about counseling. Her response was, well, if that's what you want to do. And then after she ultimately moved to Florida, we began counseling."

{¶ 27} Husband testified that it "wasn't clear as to why [Wife] wasn't paying" the mortgage. "I think she — her position was she didn't live there anymore, so she wasn't responsible." He further testified that he ultimately paid the country club bills in an amount of "maybe 10 to $15,000. * * * I liquidated a retirement plan with a pretty substantial penalty in an effort to pay down the balances of both clubs because it was a lien on the house and another threatened lien, and we couldn't sell the house with the lien. And then I used the remaining funds to make repairs to the house that the Realtor made the recommendation that we do in an effort to get the house sold." According to Husband, the retirement account he liquidated was "New Leaders For the Schools," and he "guessed" that the "balance" was "maybe 15 to $20,000 if that."

{¶ 28} Husband testified that he has two student loans with an outstanding balance of "probably about 130." According to Husband, the "vast majority is from the MBA."

{¶ 29} According to Husband's testimony, his 2017 wages from Taylor Oswald were $30,160. Husband testified that this was not a "full year." According to Husband's 2018 W-2 form, his wages from Taylor Oswald in 2018 were $123,706.67. In 2019, his wages from Taylor Oswald were $126,561.60. In 2020, his wages from Taylor Oswald were $115,838.49.

{¶ 30} Husband testified that his rent in Los Angeles is $2,295 per month. According to Husband's financial disclosure statement, his rent is $2,925 monthly, which is $630 more than he testified to. Husband testified that the discrepancy was his "fault. I transposed the 2 and the 9." According to Husband, $2,295 is the correct figure.

{¶ 31} On cross-examination, Husband testified that a portion of his student loans were incurred prior to his marriage to Wife. However, Husband testified that he is asking Wife to be responsible for student loans he incurred prior to the marriage, because it is "fair that we use our marital assets to take care of our debt * * *." Husband testified that, regarding his student loans, he did not "file a loan statement" with his financial disclosure statement. According to Husband, his two loans are with "Navient." Husband does not have "documentation" concerning his student loans, including how much of the loans were incurred during the marriage,

and "the court has no idea what portion of this was marital, and what portion of it was premarital * * *."

{¶ 32} Husband further testified that in addition to his salary at Taylor Oswald, the company paid him $12,000 per year for country club dues. Furthermore, according to Husband, his current employer paid him $20,000 to relocate. Husband's "payslip" from Aon Risk Insurance Services West, Inc., shows that from December 1, 2020, to December 15, 2020, he was paid $20,000 as a "Sign-On Bonus." Husband testified that this $20,000 "bonus" is the same $20,000 that he categorized as "relocation" monies.

{¶ 33} Husband testified that he has had a girlfriend who lives in Michigan since "maybe 2020," and he "went back and forth from Cleveland to Michigan."

{¶ 34} Husband testified that the "only [account he and Wife] had in common was the Key Bank" joint checking account. However, Husband testified that, after the parties separated, Wife stopped using the Key Bank joint checking account.

{¶ 35} As shown on a Key Bank statement, on June 17, 2019, $24,750 was deposited into the Key Bank joint checking account from the Schott Foundation, which is a former employer of Husband's. Asked if this was another retirement account that he liquidated, Husband answered, "I have to be honest, I don't recall." In April 2020, $12,500 was deposited into the Key Bank joint checking account from the Schott Foundation. Husband testified that he did "some consulting work" for the Schott Foundation.

{¶ 36} On November 4, 2019, the Schott Foundation deposited another $12,500 into Husband's Key Bank account (not the joint Key Bank account). According to Husband, this was the second payment for the consulting work he did for the Schott Foundation. Husband testified that Schott paid him $25,000 for the consulting work. Husband further testified that he "forgot" to include this $49,750 in income on his financial disclosure statement.

{¶ 37} Husband testified that from November 2018, when Wife filed the complaint for divorce, until April 2021, when Husband moved to Los Angeles, he never paid the "mortgage, taxes, insurance, or home equity line of credit."

## III. Law and Analysis

### A. Standard of Review

{¶ 38} In *Feldman v. Feldman*, 8th Dist. Cuyahoga No. 92015, 2009-Ohio-4202, ¶ 11, this court held that

> [t]he Ohio Supreme Court has long recognized that a trial court must have discretion to do what is equitable upon the facts and circumstances of each divorce case. Booth v. Booth, 44 Ohio St.3d 142, 144, 541 N.E.2d 1028 (1989). Thus, when reviewing a trial court's determination in a domestic relations case, an appellate court generally applies an abuse of discretion standard.

{¶ 39} "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). In *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), the Ohio Supreme Court held that "[a]lthough *Adams* dealt with 'abuse of discretion' in a

criminal law context, * * * the term has the same meaning when applied in a domestic relations context."

### B. Wife's Assignments of Error

#### 1. Vacating the March 18, 2019 Judgment Entry of Divorce

{¶ 40} In Wife's first assignment of error, she argues that the "trial court erred and abused its discretion in vacating the March 18, 2019 judgment entry of divorce." In Wife's 12th assignment of error, she argues that the "trial court erred and abused its discretion in holding that the March 18, 2019 judgment entry was somehow the product of 'illegal' conduct on behalf of [Wife's] counsel."

{¶ 41} The parties in the case at hand were originally granted a divorce on March 18, 2019. On April 3, 2019, Husband filed a motion to vacate the Original Divorce Decree pursuant to Civ.R. 60(B), which the court granted on July 10, 2019. Wife did not file an appeal from this final order.

{¶ 42} In *Coleman v. Coleman*, 9th Dist. Summit No. 27592, 2015-Ohio-2500, ¶ 10, the court held that the appellant's argument "was barred by res judicata because he did not file a direct appeal challenging the divorce decree. Principles of res judicata apply both to issues that were actually litigated and adjudicated in a divorce action, as well as to matters that *could* have been litigated and adjudicated." (Emphasis sic.) *See also Manning v. Jusak*, 8th Dist. Cuyahoga No. 99459, 2013-Ohio-4194, ¶ 7 (holding that the appellant "was obligated to raise any issue relating to the division of marital assets on direct appeal. Having failed to do so, she cannot now relitigate the issue some five years after the fact.").

**{¶ 43}** Because Wife failed to directly appeal the Original Divorce Decree and the order vacating the Original Divorce Decree, res judicata bars her from now challenging these journal entries. Accordingly, Wife's first and 12th assignments of error are overruled.

### 2. Duration of Marriage

**{¶ 44}** Both the second and tenth assignments of error challenge the trial court's finding that the marriage ended on November 4, 2021.

**{¶ 45}** In Wife's second assignment of error, she argues that the "trial court erred and abused its discretion in determining that the duration of the marriage between the parties was May 25, 1999[3] to November 4, 2021." Rather, Wife argues, the "trial court should have used November 30, 2018 — the date of filing of [Wife's] complaint — as the de facto termination date of the parties' marriage."

**{¶ 46}** In her tenth assignment of error, Wife argues that the "trial court erred and abused its discretion in ordering that the retirement and investments accounts should be divided equally between the parties as of November 4, 2021."

**{¶ 47}** R.C. 3105.171(A)(2) defines the term "during the marriage" as follows:

> (a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;

> (b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable

---

[3] We assume from the context of the evidence in the record that Wife meant to say that the duration of the marriage began on May 25, 1996, which is the "date of marriage," and not on May 25, 1999, which is the date used in her appellate brief.

in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

{¶ 48} Ohio courts have held that a de facto termination of marriage date "must be clear and bilateral, not unilateral * * *." *Day v. Day*, 40 Ohio App.3d 155, 158, 532 N.E.2d 201 (10th Dist.1988). In other words, a unilateral decision "of one spouse to leave the marital residence does not, in and of itself, constitute a de facto termination of marriage." *Dill v. Dill*, 179 Ohio App.3d 14, 2008-Ohio-5310, 900 N.E.2d 654, ¶ 11 (3d Dist.). The *Dill* Court listed several factors that "should guide a trial court when determining whether a de facto termination of marriage date is equitable":

> (1) the parties separated on less than friendly terms; (2) the parties believed the marriage ended prior to the hearing; (3) either party cohabited with another person during the separation; (4) the parties were intimately involved during the separation; (5) the parties lived as husband and wife during the separation; (6) the parties maintained separate residences; (7) the parties utilized separate bank accounts or were/were not financially intertwined (with the exception of temporary orders); (8) either party attempted to reconcile; (9) either party retained counsel; and (10) the parties attended social functions together or vacationed together.

*Dill* at ¶ 11. *Dill* appears to be the foremost case in Ohio to set forth a nonexclusive list of factors to consider when analyzing de facto termination of marriage dates. *See, e.g., Elder v. Elder*, 5th Dist. Fairfield No. 2008-CA-74, 2009-Ohio-4868 (citing the *Dill* factors with approval); *Sergey Sargsyan v. Gayane Martirosyan*, 10th Dist. Franklin No. 21AP-2, 2021-Ohio-4576 (citing the *Dill* factors with approval); *Suppan v. Suppan*, 9th Dist. Wayne No. 17AP0015, 2018-Ohio-2569 (citing the *Dill* factors with approval).

{¶ 49} In the case at hand, the trial court found that the duration of the parties' marriage "was May 25, 199[6] to November 4, 2021." In overruling Wife's objection to the magistrate's summary decision to set November 4, 2021, as the termination of marriage date, the court made no findings of fact and provided no written analysis regarding this determination.

> Here, the [m]agistrate heard the evidence presented by [Wife] and [Husband] and determined that it was fair, just, and equitable for the trial date of November 4, 2021 to be the termination date of the marriage. The Court has reviewed the [m]agistrate's [d]ecision and the transcripts. The Court finds, as did the Magistrate, that a termination date of November 4, 2021 is fair, just, and equitable for determining the division of property. [Wife's] objection is overruled.

{¶ 50} It is undisputed that the final hearing in the parties' divorce action was held on November 4, 2021. Using this date to determine the "duration of marriage," therefore, is in accordance with R.C. 3105.171(A)(2)(a). However, wife advocates for a de facto end of marriage date of November 30, 2018, which is when she filed her complaint for divorce, because after that date, "the parties separated; made no attempts to reconcile; and continuously maintained separate residences, separate business activities, and separate bank accounts."

{¶ 51} In reviewing this assignment of error, we apply the *Dill* factors as follows. First, the parties separated on less than friendly terms. Second, the parties believed the marriage ended prior to November 4, 2021, because, in fact, the marriage *did* end on March 18, 2019. Although the journal entry was subsequently vacated, the parties did not go back and rekindle their marital relationship. Third, although there is nothing about cohabitation specifically in the record, Husband

testified to having a girlfriend in Michigan since "maybe 2020" and spending time with her there, including nights, during the pendency of this case. Fourth, there is no evidence that the parties were intimately involved after they separated. Fifth, the parties did not live as husband and wife during the pendency of this case. In fact, Wife moved to Florida in January 2018, Wife moved her "property" out of the home in June 2019, and Husband moved to California in April 2021. Sixth, the parties maintained separate residences beginning in January 2018. Seventh, the parties utilized separate bank accounts. Testimony in the record is consistent that the parties shared one joint checking account, but that Wife did not use this account since at least October 2018. Eighth, as shown by Husband's testimony that the parties began marriage counseling after Wife moved to Florida in January 2018 and Wife's testimony that their attempt at reconciliation ended in September 2018, the parties did not attempt to reconcile after the complaint was filed in November 2018. Ninth, although it is unclear when each party retained counsel, Wife had counsel when she filed the complaint in November 2018, and Husband had counsel when he filed the motion to vacate judgment in April 2019. Tenth, there is no evidence in the record that the parties attended social functions or vacationed together.

{¶ 52} Furthermore, our review of the record shows that the parties began filing separate tax returns for 2018, which is when Wife moved out of the marital residence. Evidence in the record also shows that the parties filed separate tax returns for 2019 and 2020. Additionally, we note that on April 28, 2020, the court set a trial in this matter for November 5, and 6, 2020. On November 3, 2020,

Husband filed a "motion to convert, or in the alternative, motion for continuance" asking the court to reschedule the trial, because he "recently tested positive for Coronavirus (COVID-19) and is therefore unable to attend a trial." The court granted this motion, and trial did not occur until one year later, on November 4, 2021. Finally, we note that an abundance of exhibits entered into evidence by both parties at trial contain financial documents concerning the parties' marital property dating back to at least 2017. Therefore, the trial court had reliable data regarding the parties' finances dating back to at least 2017. *See, e.g., Saks v. Riga*, 8th Dist. Cuyahoga No. 101091, 2014-Ohio-4930, ¶ 10 ("[T]he presence or absence of reliable data concerning the value of the parties' assets is probably the most significant factor the court must consider when selecting a de facto termination date.").

{¶ 53} Overwhelming evidence in the record shows that all ten of the *Dill* factors, in addition to other relevant factors, weigh in favor of a de facto termination of marriage date being equitable. Given the lack of evidence to the contrary, we find that the trial court abused its discretion by using the date of the final hearing, November 4, 2021, as the termination date of the marriage. Accordingly, we find that November 30, 2018, which is the date Wife filed the complaint for divorce in the case at hand, is an equitable date to end the "duration of marriage" for the division of marital property. *See Katz v. Katz*, 8th Dist. Cuyahoga No. 103715, 2017-Ohio-4290, ¶ 48 and 50 (finding no abuse of discretion when the trial court used the date the complaint was filed as the de facto termination of marriage date when the parties "lived completely separate and apart" after that date). *Compare Smith v.*

*Smith*, 8th Dist. Cuyahoga Nos. 110214, 110245, and 110274, 2022-Ohio-299, ¶ 29-30 (finding no abuse of discretion when the trial court used the date the parties separated, which was one year and four months before the complaint was filed, as the de facto termination of marriage date when the parties "lived separate lives after their separation").

{¶ 54} Wife's second and tenth assignments of error are sustained.

### 3. One-Day Trial

{¶ 55} In Wife's third assignment of error, she argues that the "trial court erred and abused its discretion by only permitting [her] less than a day to present evidence." During the trial, Husband's counsel repeatedly objected to this time limitation, and the trial court repeatedly overruled the objections. Wife, on the other hand, did not challenge the court's order during trial. Rather, Wife filed an objection to the magistrate's decision regarding this issue. In overruling this objection, the court stated as follows:

> The [m]agsitrate limited both [Wife] and [Husband] to one-half day to put on their testimony and evidence. The [m]agistrate was well within his discretion to regulate the trial to avoid needless consumption of time. In addition, the [m]agistrate provided both parties the same allotment of time to present evidence. After a review of the record, the Court does not find any evidence that [Wife] was unduly prejudiced by the time limit.

{¶ 56} To support this assignment of error, Wife cites to Evid.R. 611(A), which states that a trial "court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid

needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

{¶ 57} As noted previously in this opinion, the court limited the trial in this case to one day and limited witness testimony to one hour on direct examination and one-half hour on cross-examination. Cases in which the court used its inherent power under Evid.R. 611(A) to limit a trial to one day, with preset time limitations on witness testimony, are hard to come by. Neither party cites a case on point.

{¶ 58} In *Readnower v. Readnower*, 162 Ohio App.3d 347, 2005-Ohio-3661, 833 N.E.2d 752, ¶ 11, 18 (2d Dist.), the court held that

> time limitations on evidence have been upheld when the appellant has not asserted what additional evidence they would have offered or how it would have changed the court's judgment. * * * The trial court's limitation of less than 20 minutes for each side to present evidence on spousal support, attorney fees, and the valuation/division of a business was an abuse of discretion that may have impacted the court's award of spousal support.

{¶ 59} Our review of the record demonstrates that Wife failed to establish what evidence she was prohibited from presenting given the time limitations and how she was prejudiced as a result. Accordingly, we cannot say that the trial court abused its discretion in limiting trial to one day, and Wife's third assignment of error is overruled.

### 4. The Parties' Income and Spousal Support

{¶ 60} In her fifth and 11th assignments of error Wife disputes the calculation and award of spousal support. In Wife's fifth assignment of error, she

argues that the "trial court erred and abused its discretion in determining that [Wife's] income was $325,000 for spousal support purposes."

{¶ 61} In Wife's 11th assignment of error, she argues that the "trial court erred and abused its discretion in ordering [Wife] to pay spousal support to [Husband] in the amount of $4,000 per month effective December 1, 2021, for a definite term of 96 months, without retaining jurisdiction to modify the award."

{¶ 62} R.C. 3105.18 governs spousal support awards in divorce proceedings, and it states, in pertinent part, as follows: "In divorce * * * proceedings, upon the request of either party and after the court determines the division or disbursement of property under section 3105.171 of the Revised Code, the court of common pleas may award reasonable spousal support to either party." R.C. 3105.18(A). The "court shall consider all of the following factors" when "determining whether spousal support is appropriate * * * and * * * the * * * amount * * * and duration of spousal support * * *":

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.18(C)(1).

{¶ 63} The Ohio Supreme Court has held that when determining spousal support, "the trial court must indicate the basis for its award in sufficient detail to enable a reviewing court to determine that the award is fair, equitable and in accordance with the law." *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 97, 518 N.E.2d 1197 (1988). Furthermore, "[i]n determining whether spousal support is reasonable and in determining the amount and terms of payment of spousal support, each party

shall be considered to have contributed equally to the production of marital income." R.C. 3105.18(C)(2).

{¶ 64} In the case at hand, the court improperly imputed WSPA's gross income to Wife's personal income. The court concluded that it "must find [Wife's] income for any given year is, in reality, her gross business receipts." The magistrate further found that "the federal tax returns for [Wife's] business, [WSPA,] evidences gross receipts and sales in the amount of $287,076.00 for 2018, $309,768.00 for 2019, and $325,373.00 for 2020. * * * Clearly, based on cross examination for [Wife], her income for spousal support purposes is in excess of $325,000.00." Without putting too fine a point on it, we see no mathematical formula using these three dollar amounts from WSPA's 2018, 2019, and 2020 tax returns that would result in Wife's income being "in excess of $325,000.00 per year" as found by the court. The record is also devoid of any explanation for how the court calculated that Wife owed Husband $4,000 per month for 96 months.

{¶ 65} Furthermore, the trial court cites no law, and we find no law supporting the notion that a party's business's gross receipts factor into, let alone dictate, what a party's individual income is for spousal support purposes. Based on the record before us, there is no support for imputing WSPA's gross receipts to Wife's income. Neither party provided compelling or controlling authority, and our research shows that case law is sparse on this precise issue. *See, e.g., Lichtenstein v. Lichtenstein*, 8th Dist. Cuyahoga Nos. 111887 and 112340, 2023-Ohio-3355, ¶ 39. (holding the following concerning child support calculations: "[p]ursuant to

R.C. 3119.05(A), the court is permitted to rely on supporting documentation such as a [party's individual] W-2 statement to determine income. *See In re M.C.M.*, 2018-Ohio-1307, 110 N.E.3d 694, ¶ 39 (8th Dist.)").

{¶ 66} In *Freeland v. Freeland*, 4th Dist. Jackson No. 02CA18, 2003-Ohio-5272, ¶ 16, the court held the following regarding determining a party's income for purposes of spousal support:

> Neither the Revised Code nor case law fully defines "income" for purposes of awarding spousal support. Thus, a trial court appears to possess discretion in determining what constitutes "income." However, in determining what constitutes "income," we believe that a trial court should typically use the figures shown on a party's annual income tax return. *See, generally*, Evid.R. 1002. If a trial court chooses not to use a party's annual income tax return in assessing "income," the court should explain its reasons. A trial court should not casually credit a party's oral undocumented testimony as to what the party's annual income is without explaining its reasons for not using the party's annual income as documented on the tax return.

{¶ 67} In the case at hand, WSPA's S Corporation tax returns for 2018, 2019, and 2020 were admitted into evidence as Exhibits G, H, and I. Pursuant to R.C. 3105.18(C)(1)(a), the "income of the parties" is used to determine spousal support. The statute does not say to use the income of a party's S-Corporation. *See, e.g., Cox v. Cox*, 8th Dist. Cuyahoga No. 78490, 2001 Ohio App. LEXIS 1988 (May 3, 2001) ("The amount of income the business received is not the same as the amount of income [the husband] received. * * * In calculating his gross income, we use the business' net profit of $69,322, which is the gross income he received from the business.").

{¶ 68} Furthermore, it is notable that Wife also admitted into evidence at trial WSPA's tax returns for the relevant period. Therefore, it is not logical to conclude that Wife attempted to "conceal" this information.

{¶ 69} Accordingly, we find that the trial court abused its discretion by determining that Wife's income was $325,000 annually and ordering her to pay spousal support in the amount of $4,000 per month for 96 months. Wife's fifth and 11th assignments of error are sustained. Given our disposition of Wife's second and tenth assignments of error, in which we found that November 30, 2018, is the de facto termination of marriage date in this case, the issue of spousal support should be reassessed. Wife's 2018 tax returns list her total income for that year as $199,079. Husband's 2018 W-2 from Taylor Oswald shows that he earned $123,706.67 for that year. Husband also testified that Taylor Oswald paid him $12,000 annually for country club dues, which brings his 2018 income from Taylor Oswald to $135,706,67. Because Husband's 2018 tax returns are not part of the record on appeal, we cannot say whether Husband had additional income from a source other than Taylor Oswald. On remand the trial court should use the aforementioned income amounts to reassess spousal support.

### 5. Wife's Credibility

{¶ 70} In her fourth assignment of error, Wife argues that the "trial court erred and abused its discretion in finding that [her] testimony was contradictory, misleading, and lacked reliability."

{¶ 71} In Wife's 16th assignment of error, she argues that the "trial court erred and abused its discretion in finding that [she] concealed assets."

{¶ 72} In the case at hand, the magistrate's decision[4] states as follows regarding Wife's credibility.

[Wife's] testimony was contradictory, misleading, and lacked reliability. * * * [Wife] has provided contradictory testimony to this Court concerning her residency at the time of filing of her Complaint. During the March 18, 2019, uncontested[5] hearing, [Wife] represented to this Court that she was a resident of the State of Ohio to obtain a default divorce from [Husband]. At the November 4, 2021 trial, [Wife] represented that she has been a resident of the State of Florida since February[6] 2018 to support her request for a de facto termination.

Other misrepresentations made to this Court by [Wife] include the proper identification and disclosure of her income and assets. While [Wife] testified on direct examination and filed an Affidavit with this Court representing an annual income of $150,000.00 the evidence revealed that her income exceeds $325,000.00. *See*, [Husband's] Exhibits G, H, I, NNN, and QQQ. It is clear that [Wife's] misrepresentation and non-disclosure of her true income were intended to defeat [Husband's] request for spousal support.

In an attempt to conceal assets and deprive [Husband] of an equitable division of property, [Wife] failed to disclose the significant marital funds that she has placed in her business checking account. Her

---

[4] In the interest of providing context to this case, we note that the magistrate's decision concerning Wife's credibility is taken, verbatim, from Husband's "findings of fact and conclusions of law," which he filed with the court on March 7, 2022.

[5] Contrary to the magistrate's categorization of this hearing, it was not uncontested. Both parties appeared, although Husband, who failed to file an answer to the divorce complaint, appeared at this hearing pro se. Wife's testified via direct examination by her attorney. Additionally, the court called Husband, Wife, and a friend of Wife's as witnesses, and these three people testified under oath. Asked if he "read through" the proposed judgment entry of divorce, Husband testified as follows: "I read through it, your Honor. I don't understand some of it. I don't agree with a lot of it. I think it's incorrect on several fronts." In our view, this amounts to "contesting" the divorce.

[6] As stated earlier in this opinion, Wife testified at the November 4, 2021 trial that she moved to Florida in January 2018, not February 2018.

corporate tax returns revealed that she was storing significant funds in her business accounts each year during these proceedings. The 2020 tax return revealed cash holdings in the amount of $87,018.00 and her 2018 tax return revealed cash holdings in the amount of $107,289.00. [Husband's] Exhibits G, H, and I. This Court further takes notice that the $107,289.00 of cash holding in [Wife's] possession at the conclusion of 2018 was not identified or divided in her March 18, 2019 Judgment Entry. *See*, [Husband's] Exhibit CCC.

[Wife] testified that her business does not own any property and she does not have any business expenses such as rent/mortgage, equipment, or employees. There is no reason for the business to retain cash holdings in excess of $100,000.00. At any time, those funds could have been accessed by [Wife] as additional wages and/or distributions. However, [Wife] intentionally retained the funds in her business accounts to minimize her income and deprive [Husband] of an equitable division.

This Court must find [Wife's] income for any given year is, in reality, her gross business receipts.

{¶ 73} The trial court's journal entry regarding the objections to the magistrate's decision summarily states as follows regarding Wife's credibility. "After review, the Court finds that [Wife's] testimony was in fact misleading, contradictory, and lacked credibility."

{¶ 74} "The credibility of a witness is primarily for the trier of fact to assess." *Khatib v. Peters*, 2017-Ohio-95, 77 N.E.3d 461, ¶ 28 (8th Dist.). "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 75} The trial court found Wife's testimony to be contradictory, misleading, and unreliable concerning the following two issues: her residency in Florida and her assets.

{¶ 76} First, the magistrate expressed dissatisfaction with a) Wife's testimony about moving to Florida in January 2018; and b) Wife's answer of "Yes" after being asked if she resided in Ohio for the six months prior to her filing the complaint for divorce in November 2018. Wife testified that she moved to Florida in January 2018 for a job, and she came back to Ohio during 2018 to spend time with her children. Wife did not testify that she had been a *resident* of the state of Florida since February 2018, as the trial court found. Upon review, we find nothing contradictory, misleading, or unreliable about Wife's testimony regarding this issue.

{¶ 77} Second, is the court's finding that Wife attempted "to conceal assets and deprive [Husband] of an equitable division of property" by failing "to disclose * * * significant marital funds * * *." As fully analyzed in response to Wife's fifth and 11th assignments of error, Wife did not misrepresent, conceal, or attempt to conceal assets nor did she fail to disclose significant marital funds.

{¶ 78} Upon review, we find that the trial court abused its discretion by finding that Wife was not credible. The trial court made its credibility determination based on incorrect conclusions that her testimony was misleading regarding the date she moved to Florida and that she concealed assets, as previously discussed. Because Wife's testimony was not misleading regarding the date she moved to Florida, and because no evidence in the record supported the finding that Wife

concealed her assets, the trial court abused its discretion in determining that Wife was not credible.

{¶ 79} Accordingly, Wife's fourth and 16th assignments of error are sustained.

### 6. Capital One Savings Account

{¶ 80} In Wife's sixth assignment of error, she argues that the "trial court erred and abused its discretion in ordering [her] Capital One savings account * * * to be immediately divided" 50 percent to Wife and 50 percent to Husband. Specifically, Wife argues that the "trial court found that [Wife's] Capital One Savings Account (x5569) with an approximate balance of $52,218.04 as of September 30, 2021, should be immediately divided 50/50 between" Wife and Husband. Our review of the record shows that, although the magistrate made this finding, and the court overruled Wife's objection to this finding, the court clarified that the "record shows that [Wife] has several Capital One Accounts in her name. These accounts are all associated accounts, grouped together under one umbrella account. The total of these various accounts was $52,218.04 as of September 30, 2021."

{¶ 81} Our review of exhibit No. 63 shows that Wife had six Capital One accounts, the total of which was $52,218.04 as of September 30, 2021. We find no error in the court dividing this marital asset equally between Wife and Husband. However, we find that the court abused its discretion by using September 30, 2021, as the date to determine the asset's value, because we previously determined that a

de facto termination of marriage date should be used as the valuation date of the parties' marital assets.

{¶ 82} Wife's sixth assignment of error is overruled in part and sustained in part, to the extent that the trial court, on remand, is to divide all marital assets in accordance with the valuation as of the de facto termination of marriage date.

### 7. Double-Dipping

{¶ 83} In Wife's seventh assignment of error, she argues that the "trial court erred and abused its discretion in ordering [her] to immediately pay [Husband] * * * $53,588.50" for 50 percent interest in West Side Pathology.

{¶ 84} In her eighth assignment of error, Wife argues that the "trial court erred and abused its discretion by 'double-dipping.'"

{¶ 85} Ohio courts have defined "double-dipping," as related to divorce proceedings as follows: "'the double counting of a marital asset, once in the property division and again in the [spousal support] award. More specifically, where a court uses a business owner's "excess earnings" to value the interest in the business and also fixes support on that spouse's total income (inclusive of the "excess earnings" used to value the business), a "double-dip" occurs.'" *Rossi v. Rossi*, 8th Dist. Cuyahoga Nos. 100133 and 100144, 2014-Ohio-1832, ¶ 81, quoting *Heller v. Heller*, 10th Dist. Franklin No. 07AP-871, 2008-Ohio-3296, ¶ 20. When a court has double-dipped, it has "awarded part of the same asset to plaintiff twice. This resulted in an unequal property division, not in accordance with R.C. 3105.171. Trial courts may treat a spouse's * * * business profits as a marital asset subject to division, or as a

stream of income for spousal support purposes, but not both." *Id.* at ¶ 23. *See also Dean v. Dean*, 8th Dist. Cuyahoga No. 95615, 2011-Ohio-2401, ¶ 31 (citing *Heller* with approval and holding that "Husband received his share of the marital assets from the divorce, and mandating that he now dip into this share of these assets to pay spousal support would be akin to 'drawing twice from the same well.'"); *Gaffney v. Gaffney*, 12th Dist. Butler No. CA2019-10-72, 2020-Ohio-5051, ¶ 14 (defining double dipping as "double counting of a marital asset, once in the property division and again in the spousal support award").

{¶ 86} In the case at hand, the trial court awarded Husband "$53,588.50 as and for his one-half * * * interest in the assets of" WSPA. Evidence of WSPA's 2020 S-Corporation tax returns shows that WSPA carried a cash balance of $107,177, which is presumably how the court arrived at this amount. The court should have divided the parties' marital assets as of November 30, 2018, which is the de facto termination of marriage date. Our review of the record shows that WSPA carried a cash balance of $107,289 in 2018. Therefore, Husband was entitled to $53,644.50 for his one-half interest in WSPA, and Wife's seventh assignment of error is sustained to this extent.

{¶ 87} The trial court then apparently double-dipped and added this asset of WSPA to Wife's income for the determination of spousal support. We find this to be an abuse of discretion and sustain Wife's eighth assignment of error. As stated earlier in this opinion, WSPA's assets, which are to be equitably divided as marital

property, are also not to be imputed to Wife's income for the purpose of determining the spousal support award.

### 8. Husband's Student-Loan Debt

{¶ 88} In Wife's ninth assignment of error, she argues that the "trial court erred and abused its discretion in ordering [her] to pay * * * 50% of the marital portion of [Husband's] student loan debt."

{¶ 89} In the case at hand, Husband testified that he has "probably about 130" in unpaid student loans, the "vast majority" of which was from his MBA. It is undisputed that Husband earned his MBA during the marriage. Furthermore, Husband's financial disclosure statement in this case lists "Student Loan 1" at $95,000 and "Student Loan 2" at $34,000, for a total of $129,000. There are no documents or other exhibits in the record regarding Husband's student loans. Specifically, there are no loan statements to support that the loans do, in fact, exist, and there is nothing showing what portion of the loans were incurred during the marriage. In fact, Husband testified at trial that "the court has no idea what portion of this was marital, and what portion of it was premarital * * *."

{¶ 90} This court has held that

[a]lthough R.C. 3105.171 speaks only to the division of marital assets, courts have concluded that the statute also applies to the division of marital debt. * * * This is because it is meaningless to speak only of marital assets — total equality is a function of assets and liabilities. To the extent the parties to a divorce action carry any debt, an equal division of marital assets cannot be made unless there is an equal division of marital debt, too.

*Cross v. Cross*, 8th Dist. Cuyahoga No. 102627, 2015-Ohio-5255, ¶ 30.

The decision as to whether property is marital or separate is a mixed question of law and fact and is reviewed under the manifest weight of the evidence standard. *Torres v. Torres*, 8th Dist. Nos. 88582 and 88660, 2007 Ohio 4443, ¶ 18. We will not reverse a trial court's judgment as being against the manifest weight of the evidence if it is supported by competent, credible, evidence. *See Wygant v. Wygant*, 3d Dist. No. 16-05-16, 2006-Ohio-1660.

In determining whether assets are marital or separate, the trial court is governed by R.C. 3105.171. Under the statute, marital property is defined as including "[a]ll real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage." R.C. 3105.171(A)(3)(a)(i). "Property that is acquired during the marriage is presumed to be marital property unless it can be shown to be separate." *Ockunzzi v. Ockunzzi*, 8th Dist. No. 86785, 2006-Ohio-5741, ¶ 17. Conversely, "separate property" includes all real and personal property that was acquired by one spouse prior to the marriage. *Id.*, citing R.C. 3105.171(A)(6)(a)(ii).

*Deacon v. Deacon*, 8th Dist. Cuyahoga No. 91609, 2009-Ohio-2491, ¶ 40, 41.

{¶ 91} In the case at hand, Husband's testimony establishes that nothing in the record enables one to determine what portion of his student loans were acquired prior to the marriage and what portion of his student loans were acquired during the marriage. This information is the lynchpin of determining what portion of his student loans were marital debt and what portion were Husband's separate debt. The only thing the evidence in the record shows is that not all of the debt was accumulated during the marriage. Therefore, we find that the trial court's decision to determine that all of Husband's student-loan debt was marital property is against the manifest weight of the evidence. *See Passyalia v. Moneir*, 2017-Ohio-7033, 95 N.E.3d 723, ¶ 18 (5th Dist.) ("The characterization of property as marital or separate must be supported by sufficient, credible evidence.").

{¶ 92} Accordingly, the trial court abused its discretion by ordering Wife to pay 50 percent of Husband's student-loan debt, and her ninth assignment of error is sustained.

### 9. Attorney Fees

{¶ 93} In her 13th assignment of error, Wife argues that the "trial court erred and abused its discretion in awarding $44,000.00 in attorney fees to" Husband.

{¶ 94} In divorce cases, "the court must start with the presumption that attorney fees are the responsibility of the party who retains the attorney." *Walpole v. Walpole*, 8th Dist. Cuyahoga No. 99231, 2013-Ohio-3529, ¶ 33. However, pursuant to R.C. 3105.73(A),

> [i]n an action for divorce, * * * a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors that the court deems appropriate.

{¶ 95} In awarding Husband $44,000 in attorney fees in the case at hand, the court found that "[t]here is sufficient evidence in the record to show that [Wife] made misrepresentations to the Court that delayed the resolution of this case." Specifically, the magistrate's decision states as follows:

> [Husband] incurred substantial attorney fees and litigation expenses to obtain relief from the March 18, 2019 Judgment entry prepared and submitted by [Wife] and her Counsel. The March 18, 2019 Judgment entry was gross [sic] inequitable and premised upon misrepresentations of the parties' income and assets. [Husband] was justified in seeking relief from the March 18, 2019 Judgment entry, through both the filing of his Notice of Appeal and Motion for Relief from Judgment.

This Court granted [Husband's] Motion for Relief from Judgment on July 10, 2019. * * * Thereafter, [Husband] continued to incur significant attorney fees and expenses necessary to ascertain the income and assets of [Wife]. [Husband] filed two * * * Motions to Compel Discovery in this matter, on November 4, 2019 and April 30, 2020, in an effort to obtain relevant and necessary discovery from [Wife]. As demonstrated by [Wife's] lack of candor [Husband's] discovery efforts were reasonable and necessary.

This Court must right the scaled [sic] of justice due to the improper, unjust and illegal Judgment Entry of Divorce that [Wife] and her attorneys submitted to this Court which led to the Court issuing a troubled Judgment Entry. Justice demands and dictates that [Wife] be held accountable.

{¶ 96} First, we note that the above excerpt from the magistrate's decision was cut and pasted — verbatim, including the typographical errors — from the findings of fact and conclusions of law prepared and submitted by Husband and his attorney. Second, we note that filing a motion to vacate judgment and filing an appeal of that judgment is superfluous and improper, because the appeal divests the trial court of jurisdiction to rule on the motion to vacate. *See, e.g., In re G.C.*, 8th Dist. Cuyahoga No. 109969, 2021-Ohio-2442, ¶ 9 ("'This court has repeatedly held that a trial court does not have jurisdiction to determine a motion for relief from judgment during the pendency of an appeal, and any action then taken upon a Civ.R. 60(B) motion is null and void.'") (Citation omitted.). We further note that Husband did not file a motion to compel discovery on November 4, 2019, although he did file a motion to compel discovery on April 30, 2020. Additionally, as we have previously found, Wife did not misrepresent her income or conceal her assets.

{¶ 97} As set forth in the magistrate's decision, the trial court based the attorney fee award on "the conduct of the parties" under R.C. 3105.73(A). More

specifically, the court based its decision on its unsubstantiated finding that Wife misrepresented the parties' income and assets during the March 18, 2019 proceedings and the remainder of the case. According to the court, Wife's conduct caused Husband to incur legal fees related to his: 1) motion to vacate judgment; 2) first appeal; 3) efforts to obtain discovery. Our review of the record does not support the trial court's findings.

{¶ 98} First, Husband failed to file a timely answer to Wife's complaint for divorce, and as a result, the court granted the parties a divorce. Had Husband filed an answer to the complaint, he would not have had to move to vacate the judgment. Nothing in the record suggests that Wife should be taxed for these legal fees. Second, Husband's decision to file a motion to vacate judgment and an appeal, both requesting the same relief, was redundant. Nothing in the record suggests that Wife should be taxed for these legal fees. Husband's "efforts" to obtain discovery from Wife, as indicated by the court's docket, include filing one notice of discovery requests and one motion to compel. It is worth noting that Wife also filed a motion to compel. Nothing in the record suggests that Wife should be taxed for Husband's legal fees regarding discovery motions.

{¶ 99} Our review of the docket shows that Husband filed approximately twice as many motions as Wife did. Furthermore, this case was active during the Covid-19 pandemic, which delayed trial at least once. In other words, the record does not support a finding that Wife unnecessarily delayed this case. Accordingly,

there is no evidence in the record to support an award of attorney fees to Husband based on Wife's "conduct" under R.C. 3105.73.

{¶ 100} During trial, the parties stipulated that the attorney fees for both parties were "reasonable and necessary." Wife's attorney submitted his fee bill as an exhibit during trial. Husband's attorney's fee bill is nowhere to be found in the record. Therefore, the amount of $44,000 appears to be arbitrary and capricious. The court abused its discretion by awarding attorney fees to Husband.

{¶ 101} Wife's 13th assignment of error is sustained.

### 10. Findings of Fact and Conclusions of Law

{¶ 102} In Wife's 14th assignment of error, she argues that the "trial court erred and abused its discretion in essentially adopting, verbatim, [Husband's] proposed findings of fact and conclusions of law as the trial court's findings of fact and conclusions of law."

{¶ 103} "It is not per se error for a trial court to adopt, verbatim, a party's proposed findings of fact and conclusions of law. * * * Error can only be found in such a case when the findings of fact and/or conclusions of law adopted by the trial court are against the manifest weight of the evidence." *Gerston v. Parma VTA, L.L.C.*, 8th Dist. Cuyahoga No. 105572, 2018-Ohio-2185, ¶ 68.

{¶ 104} It is undisputed that the court, via the magistrate's decision, adopted portions of Husband's proposed findings of fact and conclusions of law verbatim. This is not per se error. To the extent that the court's factual findings and legal conclusions are unsupported by the weight of the evidence in the record, this

argument has been addressed and disposed of in other assignments of error. Accordingly, Wife's 14th assignment of error is overruled.

### 11. Division of Assets, Debts, and Liabilities

{¶ 105} In her 15th assignment of error, Wife argues that the "court erred and abused its discretion in the totality of the division of assets, debts, and liabilities."

{¶ 106} Wife's entire argument under this assignment of error is as follows: "As previously stated herein the trial court erred in the totality of the division of assets, debts, and liabilities. Therefore, as each division is rectified, it is likely that the division of assets, debts, and liabilities will change so that the overall division is fair, just, and equitable."

{¶ 107} It is self-evident from this argument that the division of assets, debts, and liabilities will be "rectified" by the disposition of Wife's other assignments of error. Furthermore, pursuant to App.R. 12(A)(2), this "court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief as required under App.R. 16(A)." *See also* App.R. 16(A)(7) ("The appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.").

{¶ 108} Accordingly, we disregard Wife's 15th assignment of error.

### 12. Failure to Grant Stay Pending Appeal

{¶ 109} In Wife's 17th assignment of error, she argues that the "trial court erred and abused its discretion in failing to grant a stay of proceedings pending appeal."

{¶ 110} On March 13, 2023, Wife filed a motion under Civ.R. 62 to stay the execution of the judgments the trial court issued on February 2, and February 6, 2023. In this motion, Wife argued that the stay was necessary because of the "significant amount of monies [she] was ordered to pay" pending appellate review. She also argued that the stay should be issued "without the requirement of posting a bond." The trial court summarily denied this motion on March 15, 2023. On March 23, 2023, Wife filed in this court a motion to stay the trial court proceedings in this case. The arguments Wife set forth in her appellate motion to stay are the same arguments she set forth in her motion to stay filed in the trial court. This court denied the motion to stay on April 5, 2023.

{¶ 111} Civ.R. 62 governs motions to stay in the trial court, and the pertinent parts of this rule state as follows:

> (A) Stay on motion after judgment. In its discretion and on such conditions for the security of the adverse party as are proper, the court may, upon motion made any time after judgment, stay the execution of that judgment or stay any proceedings to enforce the judgment until the time for moving for a new trial under Civ.R. 59, moving for relief from a judgment or order under Civ.R. 60, moving for judgment notwithstanding the verdict under Civ. R. 50, or filing a notice of appeal, and during the pendency of any motion under Civ.R. 50, Civ.R. 59, or Civ.R. 60.

> (B) Stay upon appeal. When an appeal is taken the appellant may obtain a stay of execution of a judgment or any proceedings to enforce

a judgment by giving an adequate supersedeas bond. The bond may be given at or after the time of filing the notice of appeal. The stay is effective when the supersedeas bond is approved by the court.

{¶ 112} Pursuant to App.R. 7(A), a party must request a stay in the trial court prior to requesting a stay in the appellate court. Additionally, the motion for stay shall "show the reasons for the relief requested and the facts relied upon * * *." *Id.* Pursuant to App.R. 7(B), "[r]elief available in the court of appeals under this rule may be conditioned upon the filing of a bond or other appropriate security in the trial court."

{¶ 113} On appeal, Wife argues that the trial court erred by denying her motion to stay because the failure to stay these proceedings in the trial court pending appeal "is inconsistent with this Court's jurisdiction to reverse, modify, or affirm the judgment." Wife further argues that she "is entitled to appellate review before paying * * * monies to [Husband]" ordered in the divorce decree. According to Wife, "if this Court reverses or modifies the trial court's judgment, but [Husband] has already spent those monies, [she] is prejudiced and left with no recourse."

{¶ 114} Ohio courts apply the following test to rulings on motions to stay pending appeal:

In determining whether to grant a stay, the appellate court considers whether (1) substantial justice will be served by preserving the status quo, *id.*, and (2) there is a reasonable question of law presented which would result in reversal of the trial court's decision if found well-taken. *Cincinnati, Hamilton & Dayton R.R. Co. v. Duckworth*, 2 Ohio C.C. 518, 1 Ohio C.D. 618 (1887). *See also Internatl. Diamond Exchange Jewelers, Inc. v. U.S. Diamond & Gold Jewelers, Inc.*, 70 Ohio App.3d 667, 672, 591 N.E.2d 881 (2d Dist.1991), quoting *Virginia Petroleum Jobbers Assn. v. Federal Power Comm.*, 259 F.2d 921, 925, 104 U.S.

App. D.C. 106 (D.C.Cir.1958) ("(1) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal? Without such a substantial indication of probable success, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review. (2) Has the petitioner shown that without such relief, it will be irreparably injured? * * * (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? * * * (4) Where lies the public interest?").

*Fitzgerald v. Fitzgerald,* 6th Dist. Wood Nos. WD-20-026 and WD-20-48, 2020 Ohio App. LEXIS 4903, 4 (Sept. 30, 2020).

{¶ 115} Under the unique facts of this case, we determine that the issue of whether the trial court erred by denying Wife's motion to stay pending appeal is moot. Several assignments of error are being sustained with the release of this opinion, and this case is being remanded to the trial court to grant Wife the relief, in part, that she is requesting. Upon the release of this opinion, the appeal will no longer be pending, and a stay would be moot. *See Cincinnati Gas & Elec. Co. Pub. Util. Comm.,* 103 Ohio St.3d 398, 2004-Ohio-5466, 816 N.E.2d 238 (dismissing appeal as moot due to lack of any available remedy).

{¶ 116} Accordingly, Wife's 17th assignment of error is overruled as moot.

### 13. Qualified Domestic Relations Order

{¶ 117} In her 18th and final assignment of error, Wife argues that the "trial court erred and abused its discretion in adopting the qualified domestic relations order."

{¶ 118} A qualified domestic relations order ("QDRO") "implements a trial court's decision of how a pension is to be divided incident to divorce * * *." *Wilson v. Wilson,* 116 Ohio St.3d 268, 2007-Ohio-6056, 878 N.E.2d 16, ¶ 7. A QDRO

"creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." Employee Retirement Income Security Act of 1974, 29 U.S.C. 1056(d)(3)(B)(i)(I) and 26 U.S.C. 414(p)(1)(A)(i).

{¶ 119} "So long as the QDRO is consistent with the [divorce] decree, * * * the court does not lack jurisdiction to issue it." *State ex rel. Sullivan v. Ramsey,* 124 Ohio St.3d 355, 2010-Ohio-252, 922 N.E.2d 214, ¶ 19.

{¶ 120} Wife's sole argument under this assignment of error is that "a de facto termination of marriage date is appropriate for the division of assets in this case," and this concept applies to the QDRO. We agree. Accordingly, Wife's 18th assignment of error is sustained. On remand, Husband shall file an amended QDRO using the de facto termination of marriage date rather than November 4, 2021.

### C. Husband's Cross-Assignments of Error

#### 1. Failure to Award Husband a Distributive Award

{¶ 121} In Husband's first cross-assignment of error, he argues that the "trial court erred as a matter of law and abused its discretion in failing to award [Husband] with a distributive award due to [Wife's] unequivocal financial misconduct."

{¶ 122} Pursuant to App.R. 12(A)(1)(c), this assignment of error is made moot by our ruling on Wife's fourth, fifth, and 16th assignments of error.

#### 2. Spousal Support

{¶ 123} In Husband's second cross-assignment of error, he argues that the "trial court erred as a matter of law and abused its discretion in awarding [Husband]

spousal support in the amount of $4,000.00 per month, for a term of [96] months."
Rather, Husband argues, he should have received $6,125 per month indefinitely.

{¶ 124} Pursuant to App.R. 12(A)(1)(c), this assignment of error is made moot by our ruling on Wife's 11th assignment of error.

### 3. Attorney Fees

{¶ 125} In his third and final cross-assignment of error, Husband argues that the "trial court erred as a matter of law and abused its discretion in failing to award [Husband] his attorney fees and litigation expenses in the sum of $88,247.46."

{¶ 126} Pursuant to App.R. 12(A)(1)(c), this assignment of error is made moot by our ruling on Wife's 13th assignment of error.

## IV. Conclusion

{¶ 127} A summary of the disposition of all 21 assignments of error in this case follows.

{¶ 128} Assignment of error Nos. 1, 12, and 14 are overruled.

{¶ 129} Assignment of error No. 2 is sustained. This case is remanded to the trial court to amend the divorce decree to reflect that the de facto termination of marriage date is November 30, 2018. Assignments of error Nos. 6, 7, 10, and 18 are sustained in part as related to the de facto termination of marriage date. On remand, all marital assets are to be recalculated and divided using the valuation as of November 30, 2018.

{¶ 130} Assignment of error No. 3 is overruled.

{¶ 131} Assignment of error Nos. 4, 5, 8, and 16 are sustained. On remand, the trial court shall amend the divorce decree to reflect Wife's credibility determination and income, as well as a finding that Wife did not engage in financial misconduct or conceal assets, consistent with this opinion.

{¶ 132} Assignment of error No. 9 is sustained. On remand, the trial court shall reassess the division of Husband's student loans based on evidence in the record.

{¶ 133} Assignment of error No. 11 is sustained. On remand, the trial court shall amend the divorce decree to reassess spousal support taking into consideration the parties' 2018 income as previously detailed in this opinion.

{¶ 134} Assignment of error No. 13 is sustained. On remand, the trial court shall amend the divorce decree to reflect that each party shall pay their own attorney fees.

{¶ 135} Assignment of error No. 15 is disregarded under the Rules of Appellate Procedure.

{¶ 136} Assignment of error Nos. 17 and cross-assignments of error Nos. 1, 2, and 3 are moot.

{¶ 137} Judgment affirmed in part and reversed in part. Case remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellee/cross-appellant and appellant/cross-appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MARY EILEEN KILBANE, P.J., and
SEAN C. GALLAGHER, J., CONCUR