[Cite as *Kerkay v. Kerkay*, 2024-Ohio-3185.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| COLLEEN KERKAY, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 112855 |
| v. | : | |
| JEFFREY KERKAY, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 22, 2024

Civil Appeal from the Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. DR-21-385205

### *Appearances:*

John J. Ready and Associates, John J. Ready, and Sarah
E. English, *for appellee*.

Lanter Legal, LLC, and Joseph J. Lanter, *for appellant*.

LISA B. FORBES, P.J.:

{¶ 1} Jeffrey Kerkay ("Husband") appeals from the trial court's journal entry granting him and Colleen Kerkay ("Wife") a divorce. After reviewing the facts of the case and pertinent law, we affirm the lower court's judgment.

## I. Facts and Procedural History

**{¶ 2}** Husband and Wife were married on August 12, 2000, in Cleveland, Ohio. Wife filed for divorce on May 6, 2021. Husband filed an answer and counterclaim for divorce. The matter proceeded to trial on May 24, 25, and 26, 2022. The trial court heard testimony from Husband, Wife, and their respective attorneys, and over 40 exhibits were admitted into evidence.

**{¶ 3}** On August 25, 2022, the trial court issued a judgment entry of divorce. In the judgment entry of divorce, the court found the duration of the marriage to be from August 15, 2000, to May 24, 2022, the date trial commenced. The trial court also made decisions regarding the division of the couple's property, spousal support, and award of attorney fees, which will be discussed in greater detail below. Husband appealed the court's order, and Wife filed a cross-appeal under a separate case number. *Kerkay v. Kerkay*, 2023-Ohio-1479 (8th Dist.) ("*Kerkay I*").

**{¶ 4}** This court, after reviewing the trial court's judgment entry of divorce, dismissed *Kerkay I*, finding that the trial court's August 25, 2022 order was not final and appealable. *Id.* at ¶ 13. This court found the trial court failed to fully dispose of the Middle Bass Island property ("MBI Property"), which consisted of two parcels of land. *Id.* at ¶ 3. The first parcel consisted of two lots that are developed with a home. *Id.* The second parcel was a vacant lot across the street. *Id.* The trial court failed to clearly dispose of the second parcel in its August 25, 2022 journal entry. *Id.* at ¶ 9. Because the August 25, 2022 journal entry did not constitute a final appealable

order, this court did not have jurisdiction to consider the appeal. *Id*. at ¶ 13. As such, the *Kerkay I* appeal was dismissed on May 4, 2023.

{¶ 5} On May 25, 2023 the trial court issued a journal entry of divorce whereby it disposed of all the marital property, including the two lots on the MBI Property. On June 13, 2023, Husband appealed the trial court's May 25, 2023 judgment entry of divorce.

## II. Trial Testimony

### A. Husband's Trial Testimony

{¶ 6} At trial, Husband testified as follows pertinent to this appeal. The parties had been separated since November 2020. At that time Husband moved into an extended-stay hotel while waiting for his new house to be built, which he moved into on January 17, 2021.

{¶ 7} Husband testified regarding his employment and income. He was employed at Huntington National Bank as a senior vice-president. His 2021 W-2 listed his income as $285,711.11, and he received a bonus in 2022 for his work in 2021 that totaled $92,817.93. He also receives monthly income from an annuity from his deceased mother's trust in the amount of $1,072.97. According to Husband, his combined total income from all sources in 2021 was $298,586.75.

{¶ 8} Husband also testified regarding his various bank accounts, retirement accounts, and investments. Husband stated that the parties maintained separate bank accounts throughout their entire marriage. Husband had checking and savings accounts at Key Bank and Huntington and investment/retirement

accounts with Fidelity. Husband kept annuity payments from his mother's trust in a separate account by itself.

{¶ 9} Specifically, Husband testified that at the time of trial, his Key Bank Privilege account ending in 2432 had a balance of $11,291.33. This account is primarily funded by transfers from his Huntington checking account ending in 2972, where his paychecks are deposited. He testified that, as of the date of trial, his Huntington checking account had a balance of $33,168.14. He explained that he had a Key Bank Silver Money Market Savings account ending in 2325 that had a balance of $27,801.19, and he had a Key Gold Money Market Savings account ending in 2524 that had a balance of $382,470.92 as of the date of trial.

{¶ 10} Husband testified regarding the balances of his various investment and retirement accounts as well. His two Fidelity accounts ending in 6167 and 7671 had balances, as of the date of trial, of $98,687.45 and $83,589.04 respectively. Husband asserted that he had a Roth IRA that had a balance, as of trial, of $12,682.06 and that he had a Huntington 401k through Fidelity, account ending in 3511, which had a balance of $108,674.66. According to Husband, he had two retirement accounts through OPERS. One of the OPERS account is a 401K with a balance of $690,989.04. The other account is a retirement-medical account, which had a current balance of $87,240.99. Husband also testified that he received restricted stock units ("RSU") from his employer in 2021, which are held in a Fidelity account ending in 8851. As of trial, the value of the RSU account is $32,074.52.

{¶ 11} In addition, Husband explained that the parties' two adult children had individual 529 accounts, which had balances of roughly $100,000. The money was for their educational expenses. The 529 accounts were funded over the years by contributions from his bank account, his father's estate, his uncle, and his mother.

{¶ 12} Regarding real property, Husband testified that the marital home was located at 26998 Valeside Lane, Olmsted Township, Ohio, 44138 ("Valeside House").[1] In June 2020, during the marriage, he made an initial down payment of $46,653.86 for a house located at 29116 Pembrooke Boulevard, Olmsted Township, Ohio, 44138 ("Pembrooke House"). The sale price for the Pembrooke House was $214,738. Husband disputed that he used marital money to purchase Pembrooke House. He explained that he put a deposit down for $10,737 and then paid the remaining $35,916.86 in cash at the closing. According to Husband, both payments came from his Key Bank account ending in 2432. Husband also testified that he spent approximately $10,000 on furniture and furnishings for the Pembrooke House. Husband again disagreed that the funds were marital, but Husband established that household items were bought with credit cards and paid off from the Key Bank Account ending in 2432. Husband testified that, as of trial, he had paid $11,221.12 in mortgage payments for the Pembrooke House and he had spent a total of $67,874.98 on the Pembrooke House.

---

[1] The parties reached an agreement to sell the Valeside House after trial. The property has since been sold and the proceeds were evenly split.

{¶ 13} Husband also testified that he had a property interest at 8040 Barbara Dr., Strongsville, Ohio, 44136 ("Barbara Dr. House") by virtue of a trust where he is the trustee and beneficiary. His sister is also a beneficiary. The Barbara Dr. House is owned by the trust created by his mother. There is no mortgage. The property is occupied by his sister. Husband testified that in 2021 he spent $21,122.94 money from his 2432 Key Bank checking account to improve the Barbara Dr. House.

{¶ 14} Husband testified regarding the MBI Property. This property consists of two parcels. The first parcel is located at 169 Anchor Lane, Middle Bass, Ohio, 43446, and is labeled as lot Nos. 438 and 439 Burgundy Bay 3. This parcel is developed with a home on it. The second parcel is an undeveloped lot across the street. The parties own a jet ski, a fishing boat, a golf cart, and an old 2003 Chevy S-10 truck, which they keep at the MBI Property.

{¶ 15} Husband owned a Dodge Durango SUV that is paid off. During the marriage he acquired Zsolnay pottery pieces from his father and he took most of the pieces with him when he moved out of the marital home, despite the trial court's mutual restraining order.

**B. Wife's Trial Testimony**

{¶ 16} Wife testified at the trial as well. She explained that she stopped wearing her wedding ring in January 2020. She did not recall the last time she and Husband had been intimately involved. According to Wife, Husband moved out of

the marital home on December 1, 2020. The parties had no prior agreement on how they were going to terminate the marriage, divide property, or allocate debt.

{¶ 17} Wife testified regarding her income, various bank accounts, and real property acquired during the marriage. Wife explained that she gets paid $5,744.24 twice a month or 26 times a year. Annualized, her salary is $149,350.24 a year. Roughly 30-40 percent of the time throughout the marriage Husband and Wife filed their taxes as "married filing separately," on the advice of their accountants depending on what would be most financially beneficial to them.

{¶ 18} Wife stated that she had always had a separate bank account where her paycheck got deposited. Throughout their marriage, Wife paid her own credit card bills and made her own car payments. Wife testified that she managed her own retirement accounts and Husband managed his.

{¶ 19} Regarding her bank accounts, Wife had two Key Bank accounts: a Key Advantage money market checking account ending in 5637, with a balance of $6,101.20 as of trial, and a MajorSaver money market account ending in 5629 that had a balance of $25,865.76 as of trial. Wife also had a Fidelity managed health-savings account ending in 437 from a previous employer, which had a balance of $389.10 as of trial.

{¶ 20} Regarding her investment accounts, Wife testified that she had a Fidelity investment account that ends in 1739, with a balance of $69,046.12 at the time of trial. She had another Fidelity account ending in 2697, which was an individual transfer-on-death account with a balance of $113.88.

{¶ 21} Wife testified regarding her retirement accounts at the time of trial: a Fidelity rollover IRA account ending in 8645 that had a balance of $557,342.28; a Materion savings account ending in 4404, which had a balance of $8,444.87; and a 401K with her current employer through Empower, with a balance of $17,315.82 as of trial.[2]

{¶ 22} Wife also testified that she had life insurance through New York Life, but it is expiring this year. The benefit payout is $250,000. She had been paying the premiums as of the date of trial.

{¶ 23} Regarding real property, Wife stated that for the majority of their marriage, Husband paid the mortgage for the Valeside House. Once he moved out in December 2020, the parties began alternating paying the mortgage. They alternated paying the real estate taxes as well, with Wife paying the first half of the year and Husband paying the second half. Wife paid the utilities for the Valeside House and for general improvements to the house, such as installing a concrete patio, finishing the basement, and updating appliances and carpeting.

{¶ 24} Wife testified that prior to the marriage, she had owned property located at 4600 East Utah Plane, Denver, Colorado, 80222 ("Denver House"). Wife sold the Denver House after the parties married, netting $43,368,52 in profit after

---

[2] In the trial court's judgment entry for divorce, it erroneously lists Husband's retirement accounts as plaintiff's assets even though he was the defendant in the lower court. It does the same for Wife's retirement accounts, which are listed as defendant's even though she was the plaintiff in the lower court. The trial court also erroneously identifies Wife's Fidelity IRA account as ending in 3645, but according to the trial testimony and relevant exhibits, the account ends in 8645.

paying off the mortgage. Wife testified this money was given to Husband to invest and that some of the funds were also used to put a down payment on the Valeside House and to pay for some furnishings. Husband never reimbursed her for any portion of the money from the Denver House sale.

{¶ 25} Wife testified that until Husband's deposition, she had been unaware that he had used marital funds to purchase and furnish the Pembrooke House or to make improvements at the Barbara Dr. House.

{¶ 26} Regarding the MBI Property, Wife testified that Husband had quitclaimed one of the two parcels to her during the parties' initial mediation, before filing for divorce. Wife refinanced the mortgage on that parcel and put it in her name only. Combined, she believes the parcels of the MBI Property are valued at $198,000, but there is an outstanding mortgage on the property for $106,826.23. Wife had been making the payments for the fishing boat, which she claimed had a fair market value of $25,000, and for the golf cart, both of which are kept on the MBI Property. Wife testified that she made the monthly payments for the boat and golf cart out of her paycheck and that Husband never contributed to the payments for either the boat or golf cart.

{¶ 27} Wife testified that she had a 2017 Mercedes GL 350, which had an outstanding loan in the amount of $13,874.95 at the time of trial. According to Wife, Husband owns two vehicles that were being used by the children: a Ford Escape and a Jeep Patriot. Wife did not contribute to the acquisition or maintenance of those vehicles. Wife considered them to be the children's vehicles.

{¶ 28} Wife did not dispute Husband's testimony concerning the funding of the children's 529 accounts and agreed that she never deposited any funds in this account from her paycheck. Wife testified that Husband deposited marital funds from his checking account into the 529 accounts for the children.

{¶ 29} Wife testified that the Zsolnay pottery were gifts given to her and Husband from Husband's father. Wife testified that Husband took most of the Zsolnay pottery, but he did leave some smaller pieces in the Valeside House. Husband had over 20 pieces total and left maybe five pieces at the Valeside House. Wife had researched the value of the pottery pieces and determined they are individually worth several hundred to a couple thousand dollars depending on the piece.

### C. Attorney Fees

{¶ 30} After Wife's testimony concluded, both parties' attorneys testified and presented evidence of their hours and expenses for this case.

### III. Trial Court's Judgment Entry of Divorce

{¶ 31} The trial court's judgment entry for divorce was filed on May 25, 2023. The court found that Husband's argument for a de facto termination date of the marriage was insufficient to overcome the statutory presumption that the proper date for termination of the marriage is the date of the final hearing. The trial court found that

> [w]hile the parties no longer lived in the same residence, had not utilized separate bank accounts throughout the marriage, and made no attempts at reconciliation, the parties did make mortgage payments on their property together, paid taxes and insurance jointly, and made the

decision together to sell the former marital home. While the marital relationship was certainly strained the parties were still financially entangled as they were during the marriage and did, at least in a limited capacity, contribute to each other for their mutual benefit.

As such, the trial court found, consistent with R.C. 3105.171(A)(2)(a), that the duration of the marriage was from August 15, 2000, to May 24, 2022.

{¶ 32} The court made the following findings concerning the parties' properties. The trial court found that, despite Wife's assertion that proceeds from her Denver House sale were used to make a down payment on the Valeside House, that she failed to properly trace those funds, which were comingled with marital funds pursuant to R.C. 3105.171(6)(b), such that she was not entitled to compensation for it.

{¶ 33} As stated above, the parties sold the Valeside House after trial and the court ordered them to split the proceeds equally. As for the Pembrooke House, the court found that it should be awarded to Husband, but also found that he used $67,874.98 of marital funds to purchase the home, make mortgage payments, and furnish the home. Husband was ordered to pay Wife $33,937.49 for her half of the marital funds.

{¶ 34} The court also found that Husband spent $21,222.94 in marital funds on the Barbara Property and ordered him to compensate Wife for her half of those marital funds. As such, Husband was ordered to pay $10,611.47 to Wife.

{¶ 35} The court found the parties maintained the following bank accounts with marital funds: one Huntington bank account (2972), four Key Bank accounts

(2325, 2432, 5629, 5637), and five Fidelity accounts (6167, 7671, 1739, 4437, 2629). The court ordered the parties to divide these accounts equally as of the date of trial. Husband also maintained the RSU with Fidelity (8851), which the court ordered him to pay one half of the value of the stock as of May 24, 2022, to Wife.

{¶ 36} The court found Husband's KeyBank Gold Money Market Savings Account (2524) and other monetary and real property assets inherited by Husband to be separate property not subject to division.

{¶ 37} Regarding the parties' retirement assets, the court found that all funds from Husband's Fidelity Rollover IRA (2315), Fidelity Roth IRA (7680), Huntington 401k with Fidelity, OPERS and OPERS RMA accounts as well as Wife's Empower 401k (9336), Fidelity IRA (8645) and Materion Savings account (4404) were all earned during the marriage and ordered the parties to divide the funds equally between them.

{¶ 38} Wife's Mercedes GL 350, the fishing boat, golf cart, and 2003 Chevy S10 truck were awarded as personal property to Wife. Husband was awarded his Durango SUV and the Zsolnay pottery. The court found that the 529 accounts and the two vehicles in Husband's name were for the children and shall be maintained for their benefit until transferred to them.

{¶ 39} The trial court found both parties' attorney fees and litigation expenses were reasonable. The trial court then awarded Wife her attorney fees in the amount of $50,097.94, finding

that the award is equitable considering the parties marital assets and income, and [Husband's] conduct, particularly due to the fact that he did not provide the Court with current financial information, his representations that assets where his separate property contrary to law, his appropriation of marital funds for his sole benefit, and his removal of most of the Zsolnay Pottery in contravention of the Court's Mutual Restraining Orders.

{¶ 40} Last the court made findings regarding spousal support. The court found, upon consideration of all factors set forth in R.C. 3105.18(C)(1), that it is appropriate and reasonable for Husband to pay spousal support to Wife.

> The Court finds the following factors in support of the award: Income of the parties[,] Relative earning abilities of the parties, Duration of the marriage, Standard of Living of the parties established during the marriage, and the Relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties.

The court ordered that Husband shall pay spousal support to Wife in the sum of $3,000 a month for 72 months commencing May 24, 2022. The court retained jurisdiction to modify the support.

{¶ 41} It is the trial court's May 25, 2023 judgment entry of divorce that Husband appeals. He raises five assignments of error:

**Husband's First Assignment of Error**
The trial court abused its discretion when it failed to use a de facto termination of marriage date.

**Husband's Second Assignment of Error**
The trial court abused its discretion when it failed to value marital property, failed to make an equal division of marital property as required by R.C. 3105.171(C)(1), consider the R.C. 3105.171(F) factors when making a division of marital property, and by failing to make written findings of fact supporting the determination that marital property has been equitably divided.

**Husband's Third Assignment of Error**
The trial court abused its discretion when it awarded [Wife] spousal support from [Husband] in the sum of $3,000.00 per month for a term of seventy-two (72) months in the second decree of divorce issued May 26, 2023.

**Husband's Fourth Assignment of Error**
The trial court abused its discretion when it increased the duration of spousal support from sixty (60) months as ordered in the initial decree of divorce on August 25, 2022 to seventy-two (72) months in the second decree of divorce issued May 26, 2023.

**Husband's Fifth Assignment of Error**
The trial court abused its discretion by awarding [Wife] all of her attorney fees, in the amount of $50,097.98

## IV. Law and Analysis

### A. Assignment of Error 1 — Duration of Marriage

{¶ 42} Husband's first assignment of error argues that the trial court abused its discretion when it failed to use his proposed de facto termination date for the marriage. Husband argues that the trial court should have found the de facto termination date of June 30, 2020.

{¶ 43} "Normally, the date of the final hearing in a divorce proceeding is presumed to be the termination date of the marriage, unless the court determines that the use of that date would be inequitable in determining marital property." *Smith v. Smith*, 2022-Ohio-299, ¶ 23 (8th Dist.), citing *Kobal v. Kobal,* 2018-Ohio-1755, ¶ 19 (8th Dist.). "[T]he date of the final hearing is presumed to be the appropriate termination date of the marriage unless the court, in its discretion, uses a de facto termination." *O'Brien v. O'Brien*, 2008-Ohio-1098, ¶ 40 (8th Dist.), citing

R.C. 3105.171(A)(2).  We will not reverse the trial court's decision absent an abuse of discretion.  *Id.* at ¶ 41.

{¶ 44} R.C. 3105.171(A)(2) defines the term "during the marriage" as follows:

(a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;

(b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property.  If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

Ohio courts have held that a de facto termination of marriage date "'must be clear and bilateral, not unilateral. . . .'"  *Machen v. Miller*, 2024-Ohio-1270, ¶ 48 (8th Dist.), quoting *Day v. Day*, 40 Ohio App.3d 155, 158 (10th Dist. 1988).  A unilateral decision "'of one spouse to leave the marital residence does not, in and of itself, constitute a de facto termination of marriage.'"  *Machen* at ¶ 48, quoting *Dill v. Dill*, 2008-Ohio-5310, ¶ 11 (3d Dist.).  The *Dill* Court identified several factors that "should guide a trial court when determining whether a de facto termination of marriage date is equitable":

(1) the parties separated on less than friendly terms; (2) the parties believed the marriage ended prior to the hearing; (3) either party cohabited with another person during the separation; (4) the parties were intimately involved during the separation; (5) the parties lived as husband and wife during the separation; (6) the parties maintained separate residences; (7) the parties utilized separate bank accounts or were/were not financially intertwined (with the exception of temporary orders); (8) either party attempted to reconcile; (9) either party retained counsel; and (10) the parties attended social functions together or vacationed together.

*Dill* at ¶ 11. "Dill appears to be the foremost case in Ohio to set forth a nonexclusive list of factors to consider when analyzing de facto termination of marriage dates." *Machen* at ¶ 48.

{¶ 45} In the case at hand, the trial court found that the duration of the parties' marriage was from August 15, 2000, to the date of the final hearing on May 24, 2022. The trial court found that Husband's proposed arbitrary de facto termination date of June 30, 2020, did not overcome the statutory presumption that the proper date for termination of the marriage is the date of the final hearing.

{¶ 46} Applying the *Dill* factors, the parties separated on less than friendly terms, but there is nothing in the record to suggest the parties thought the marriage ended on June 30, 2020. The parties lived together for six more months, after Husband's de facto date, before they separated in December 2020. There was no evidence that either party cohabitated with another person or that they were intimately involved during the separation. The record does show that even when the parties no longer lived in the same residence and had not attempted reconciliation, they continued to use separate bank accounts as they had throughout the entire marriage. Nonetheless, the parties were financially intertwined as they continued to make mortgage payments on the marital home together and to pay the taxes and insurance jointly, and they made the decision to sell the marital home together after their son graduated from high school. The parties did attempt to mediate prior to filing for divorce, but by the time Wife filed for divorce in May 2021 both parties had retained counsel. Last, there is evidence that the parties attended

their son's high school graduation party together but had discontinued family vacations together. *Dill* at ¶ 11.

{¶ 47} Overall, the court found that while the marital relationship was strained before trial, the parties were as financially entangled as they had been throughout the marriage and did, in at least a limited capacity, contribute to each other for their mutual benefit. Their financial entanglement lasted long after June 30, 2020. Nothing in the record supported June 30, 2020, as the date for the termination of the marriage.

{¶ 48} Upon our review of the record and considering the *Dill* factors, we find that Husband failed overcome the statutory presumption or demonstrate the trial court abused its discretion in applying the statutory presumption. Husband's first assignment of error is overruled.

## B. Assignment of Error 2 — Equitable Division of Marital Assets

{¶ 49} Husband argues that the trial court abused its discretion, made an inequitable division of the marital property, and failed to make findings for any of the value of the marital assets. We disagree.

{¶ 50} "In any divorce action, the starting point for a trial court's analysis is an equal division of marital property." *Daniel v. Daniel*, 2014-Ohio-1161, ¶ 7, citing R.C. 3105.171(C)(1); *Neville v. Neville*, 2003-Ohio-3624, ¶ 5. "Pursuant to R.C. 3105.171(C), it is only when an equal division of marital property would be inequitable that a trial court must instead divide it between the spouses in the manner that the court determines to be equitable with consideration of all relevant

factors, including the factors set forth in R.C. 3105.171(F)." *Halton v. Halton*, 2024-Ohio-1165, ¶ 11 (8th Dist.). These factors include the duration of the marriage, the assets and liabilities of the spouses, tax consequences of the property division, any retirement benefits of the spouses, and "[a]ny other factor the court expressly finds to be relevant and equitable." *La Spisa v. La Spisa*, 2023-Ohio-3467, ¶ 31 (8th Dist.), citing R.C. 3105.171(F)(1)-(10). A trial court is not required to enumerate each factor but must address the relevant factors in sufficient detail to enable an appellate court to determine whether the award is fair, equitable, and pursuant to law. *Id.*, citing *Walpole v. Walpole*, 2013-Ohio-3529, ¶ 20 (8th Dist.).

{¶ 51} "'Since a trial court has broad discretion in the allocation of marital assets, its judgment will not be disturbed absent an abuse of discretion.'" *Halton* at ¶ 11, quoting *Neville* at ¶ 5. As long as the trial court's division of property, calculation of income, and award of spousal support are supported by some competent, credible evidence, this court will not disturb the trial court's decision. *Bandza v. Bandza*, 2021-Ohio-4011, ¶ 12 (8th Dist.), citing *Masitto v. Masitto*, 22 Ohio St.3d 63, 66 (1986).

{¶ 52} In its judgment entry, the trial court stated that it considered all the factors in R.C. 3105.171(F) before ordering division of the marital properties, factoring in the duration of the marriage, the assets and liabilities of each spouse, and retirement benefits of the spouses. *La Spisa* at ¶ 31.

**{¶ 53}** In its judgment entry, the trial court equally divided the parties' multiple checking, savings, retirement, and investment accounts based on the account balances as of the day of trial.

**{¶ 54}** The trial court also equally divided the parties' equity in the Valeside House, ordering the funds from the sale to be distributed equally between them. The trial court considered the parties' joint-ownership interests in both the Pembrooke House and the MBI Property. The court heard testimony that the sale price of the Pembrooke house was $214,738 and awarded the newly built house to Husband, less the marital funds he used to buy and furnish the property. Similarly, the court heard testimony that the MBI Property had an appraised value of $198,000, and the court awarded the MBI Property to Wife.

**{¶ 55}** In distributing the parties' personal property, the court endeavored to equally distribute the assets. Husband was awarded his Dodge Durango and all the Zsolnay pottery pieces, which individual pieces were worth hundreds to thousands of dollars depending on the piece. Wife was awarded her Mercedes GL350, the 2003 Chevy S10 truck, the fishing boat, and the golf cart at the MBI Property. The court also found Husband's Key Bank Gold Money Market Savings account inherited from his mother, which had a balance of $382,470.92, was not marital property.

**{¶ 56}** The court found the 529 accounts and two vehicles in Husband's name are for the children's use, are owned for the benefit of the parties' children, and shall be maintained for the children's benefit until the accounts and vehicles are transferred to the parties' children.

{¶ 57} Upon review of the entire record, we find the trial court did not abuse its discretion in its division of marital properties and assets because its division is supported by competent, credible evidence both through the parties' testimony and the exhibits presented. *See Bandza*, 2021-Ohio-4011, at ¶ 12 (8th Dist.). Husband's second assignment of error is overruled.

### C. Assignments of Error 3 and 4 — Award and Duration of Spousal Support

{¶ 58} Husband's third and fourth assignments of error concern the trial court's award of spousal support and will, therefore, be considered together. First Husband argues the trial court abused its discretion in awarding Wife spousal support in the sum of $3,000 a month for 72 months. Second, Husband argues that the trial court abused its discretion by increasing the duration of spousal support from 60 months to 72 months.

{¶ 59} R.C. 3105.18 governs spousal support awards in divorce proceedings, and it states, in pertinent part, as follows: "In divorce . . . proceedings, upon the request of either party and after the court determines the division or disbursement of property under section 3105.171 of the Revised Code, the court of common pleas may award reasonable spousal support to either party." R.C. 3105.18(A); *Machen*, 2024-Ohio-1270, at ¶ 62 (8th Dist.). The "court shall consider all of the following factors" when "determining whether spousal support is appropriate . . . and . . . the . . . amount . . . and duration of spousal support . . .":

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

R.C. 3105.18(C)(1).

{¶ 60} In determining whether to grant spousal support and in determining the amount and duration of the payments, the trial court must consider the factors listed in R.C. 3105.18(C)(1)(a)-(n). *Deacon v. Deacon*, 2009-Ohio-2491, ¶ 58 (8th Dist.), citing *Kaechele v. Kaechele*, 35 Ohio St.3d 93 (1988), paragraph one of the syllabus. The goal of spousal support is to reach an equitable result. *Id.*, citing *id.* And while there is no set mathematical formula to reach this goal, the Ohio Supreme Court requires the trial court to consider all 14 factors of R.C. 3105.18(C) and "not base its determination upon any one of those factors taken in isolation." *Id.*, citing *id.*; *see also Kehoe v. Kehoe*, 2012-Ohio-3357, ¶ 18 (8th Dist.). The "trial court is not required to comment on each statutory factor; rather, the record must only show that the court considered the statutory factors when making its award." *Comella v. Parravano*, 2014-Ohio-834, ¶ 13 (8th Dist.).

{¶ 61} The award of spousal support lies within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Deacon* at ¶ 58, citing *Holcomb v. Holcomb*, 44 Ohio St.3d 128, 130-131 (1989). "So long as the decision of the trial court is supported by some competent, credible evidence going to all the essential elements of the case, we will not disturb it." *Neumann v. Neumann,* 2012-Ohio-591, ¶ 16 (8th Dist.), citing *Masitto,* 22 Ohio St.3d 63, at 66.

{¶ 62} The trial court in its judgment entry found:

[U]pon considering all of the factors set forth in Ohio Revised Code § 3105.18(C) and in particular those specified below, that it is

> appropriate and reasonable for [Husband] to pay spousal support to [Wife].
>
> The Court finds the following factors in support of the award: Income of the parties[,] Relative earning abilities of the parties, Duration of the marriage, Standard of Living of the parties established during the marriage, and the Relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties.

The trial court then ordered Husband to pay Wife $3,000 a month in spousal support for 72 months, commencing May 24, 2022.

{¶ 63} Husband argues that the trial court's spousal-support award is inequitable and that the trial court's judgment entry contains no details for this court to determine that the award is fair and equitable. Husband also argues that the trial court made no findings as to the income of the parties, relative earning capacity, standard of living of the parties established during the marriage, and the relative assets of the parties. Last, Husband argues that the order is not supported by the record as applied to the factors set forth in R.C. 3105.18(C)(1).

{¶ 64} Upon review of the record, we find no abuse of discretion in the amount of spousal support awarded to Wife. Although Husband argues broadly that the award is unfair, the record overwhelmingly demonstrates otherwise. Applying the relevant statutory factors, it is clear there is a significant disparity in income between Husband and Wife. Husband's total income in 2021 was $298,586.75 whereas Wife's income was $149,350.24. The court also considered the duration of the marriage, which was just a few months short of 22 years. Wife testified that during that time, she had become accustomed to a certain standard of living. Both parties described the standard of living they had as "comfortable." The parties

enjoyed a second home on Middle Bass Island, which had a fishing boat, golf cart, and a jet ski. The parties also testified to the many regular family vacations the parties went on. The trial court also considered the relative assets and liabilities of the parties, such as Husband's real-property interests in the Pembrooke House and the Barbara Dr. House as well as his multiple retirement/investment accounts and annuity payments from his mother's trust. *Deacon*, 2009-Ohio-2491, at ¶ 61 (8th Dist.); *see Gallo v. Gallo*, 2002-Ohio-2815, ¶ 40 (11th Dist.) ("To be equitable, the parties should, if feasible, enjoy a standard of living comparable to that enjoyed during the marriage, adjusted by the factors set forth in R.C. 3105.18.").

{¶ 65} We find the evidence in the record supports the trial court's award of $3,000 a month in spousal support to Wife for 72 months and that the award is equitable. The award was within the trial court's sound discretion. *See Deacon at* ¶ 58, citing *Holcomb*, 44 Ohio St.3d 128, at 130-131; *see also Salpietro v. Salpietro*, 2023-Ohio-169, ¶ 5 (6th Dist.) (appellate court upheld as reasonable for a ten-year marriage a spousal support of $13,000 per month for four years, followed by $10,000 per month for ten years, and then $6,000 per month indefinitely); *Poe v. Poe*, 102 Ohio App.3d 581 (3d Dist. 1995) (The appellate court concluded that the 20-year spousal support award for a 20 year marriage was not an abuse of discretion.).

{¶ 66} Husband also argues that the trial court abused its discretion by increasing the duration of the spousal-support award from its initial August 25,

2022 judgment entry. In the August 2022 judgment entry, the court awarded Wife $3,000 a month in spousal payments for 60 months.

{¶ 67} Prior to the entry of a final decree, temporary spousal and child-support orders are provisional in nature, subject to modification, and do not constitute final appealable orders. *Palnik v. Crane*, 2019-Ohio-3364 ¶ 32 (8th Dist.), citing *Kelm v. Kelm*, 93 Ohio App.3d 686, 689 (10th Dist. 1994). Further, this court is limited to review of the final judgment designated in Husband's notice of appeal. *In re Guardianship of Brady*, 2004-Ohio-5972, ¶ 15 (8th Dist.) ("A reviewing court's review is limited to a review of the judgment designated in the notice of appeal."). Husband points to nothing in the record to suggest that the trial court's reassessment of the duration of spousal support on remand was an abuse of discretion. Additionally, Husband does not point to any case law demonstrating the trial court abused its discretion awarding Wife spousal support. The award was within the trial court's sound discretion. *See Deacon,* 2009-Ohio-2491, at ¶ 58 (8th Dist.), citing *Holcomb* at 130-131.

{¶ 68} Husband's third and fourth assignments of error are overruled.

### D. Assignment of Error 5 — Award of Attorney Fees

{¶ 69} In Husband's last assignment of error, he argues that the trial court abused its discretion by awarding Wife her attorney fees in the amount of $50,097.98. We disagree.

{¶ 70} An award of attorney fees lies within the sound discretion of the trial court. *Rand v. Rand*, 18 Ohio St.3d 356, 359 (1985). In order to find an abuse of

discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore,* 5 Ohio St.3d 217.

{¶ 71} R.C. 3105.73(A) provides:

In an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court *may* consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

(Emphasis added.) *Robinson v. Robinson*, 2012-Ohio-5414, ¶ 26-27 (8th Dist.).

{¶ 72} Both parties' attorneys testified and presented evidence of their hours and expenses for this case. The trial court found both parties' attorney fees and litigation expenses were reasonable. The trial court then awarded Wife her attorney fees in the amount of $50,097.94, finding

that the award is equitable considering the parties marital assets and income, and [Husband's] conduct, particularly due to the fact that he did not provide the Court with current financial information, his representations that assets were his separate property contrary to law, his appropriation of marital funds for his sole benefit, and his removal of most of the Zsolnay Pottery in contravention of the Court's Mutual Restraining Orders.

Consistent with R.C. 3105.73(A), the trial court considered the parties marital assets and income as well as the conduct of the parties. Specifically, Husband did not provide the court with current financial information despite several court orders to do so, until he was on the stand at trial. While testifying he insisted marital funds were his to use to buy things such as the Pembrooke House and Barbara Dr. House.

The court also noted that he removed all the Zsolnay pottery despite the court's mutual restraining order.

**{¶ 73}** The court's entry demonstrates compliance with R.C. 3105.73(A) and is supported by competent, credible evidence. Therefore, the award of Wife's attorney fees is not an abuse of discretion. Husband's fifth assignment of error is overruled.

**{¶ 74}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
SEAN C. GALLAGHER, J., CONCUR